PA Dept of Corrections Case No. 19-3305. We have 15 minutes allocated for counsel for appellate that will be divided between two law students from the University of Virginia, and I understand that their supervising attorney, Mr. Ballinger, will be giving a brief introduction, and then we'll start. Thank you, Your Honor. My name is Paul Ballinger. I'm the Director of the Appellate Litigation Clinic at the University of Virginia School of Law, and it's my pleasure to introduce Ms. Virginia Oat and Jennifer Elshusak, who will be presenting argument for Mr. Zemechieli. Thank you very much. Ms. Oat, I understand that you will be starting? Yes, Your Honor. Would you like to reserve any time for rebuttal? Yes, we'd like to reserve five minutes for rebuttal. Okay. Is that between both law students or just for you? Your Honor, the plan is that I will speak for 10 minutes, and my co-counsel, Jennifer Elshusak, will speak for five minutes in rebuttal. Oh, okay. All right, very good. Thank you, and may it please the Court. Virginia Oat for the Appellant Lamont Zemechieli. The District Court's summary judgment order rests on two errors of law that this Court should correct. First, the Court's holding that Mr. Zemechieli failed to exhaust his administrative remedies fundamentally misunderstands both the PLRA's exhaustion requirement and the prison's grievance process. And second, by holding that his retaliation claims could be rejected simply because the defendants came forward with a written explanation for the discipline imposed, the Court applied the misplaced due process standards that this Court has already rejected in Watson v. Rossum. Starting first with the exhaustion issue, Mr. Zemechieli suffers from a seizure disorder that the Department of Corrections itself has determined requires him to be housed on a lower-tier cell. And despite this required a correction in his prison file, he was assigned to an upper-tier cell. And as a result, he had a seizure while using the stairs cell. Let me just interject two things here. One, it strikes me that in your brief, in your appellate brief, you say that he challenged the District Court's exhaustion ruling with respect to only the fall. There might be other reasons that Mr. Zemechieli doesn't like his accommodations, his ability to participate in programs, other things like this, but at least in your opening appellate brief, it relates only to the fall. And at least as I read his complaint, his handwritten complaint, he didn't say he had a seizure while he was going up and down between the cells. He said he fell and had a seizure afterwards. So maybe I misread that. It is handwritten and there might be other nuggets in that handwritten record that explain things, but I guess I've got two parts to the question. The first one is your exhaustion argument as raised here seems to be limited to only the fall. And then please confirm. And then second, just as a matter of fact, it was fall, then seizure, not seizure, then fall, right? To your first question, yes, Your Honor, the exhaustion issue is in regards to the fall that suffered because he was assigned to an incorrect cell and as a result had to use the stairs to go from the upper tier cell to the lower tier cell. As to the question of whether or not it was a fall, then seizure, or a seizure, then fall, that's a merit. That's a question to be answered on the merit. As we understand it, it's that he had a seizure that it was the seizure that caused the fall. But again, that would be a question that has to be answered on the merit. Well, I mean, just tease this out, right? In order to get something to the merits, you have to exhaust that. And if what his grievance says is fall, then seizure, what he's exhausted or not, what he would have exhausted is a claim for fall, then seizure. He doesn't get to just say, now I've exhausted that angle. Now I want to go in a completely different direction for seizure than fall. I mean, it seems like once he walks in what it is, it's almost like if a prisoner complains about a broken radio, they can't then say, well, I was also denied other electronic devices too, like access to the TV and cable TV and these other things. Sooner or later, we have to look at what that is to give the prison a fair opportunity to correct it. Your Honor, while the issue of whether or not it was the seizure and then the fall and then the seizure, it is a merits question that's specific to the fall itself. The fall is still taken together with this issue that had he not been assigned the upper tier cell in the first place, which is what resulted in all of these other issues, such as not having access to the other services that Your Honor is discussing. That doesn't change the fact that his accommodation that was required by the DOC in his file since March of 2015 still required him to be on a lower tier cell, and yet they assigned him to an upper tier cell. But again, all of these questions cannot be answered until we get past the threshold issue of whether or not he had exhausted his administrative remedies with the merits question of whether or not the prison could possibly have known that he needed this accommodation, which is a merits question. Turning further to the district court's opinion on this, the issue is that the district court essentially decided that he had failed to exhaust his administrative remedies because he had not given essentially the prison notice that they were required to house him on a lower tier cell. This has nothing to do with the question of exhaustion, which is a threshold issue before we reach the question of the merits, which would be the notice issue. The prison's grievance rules dictate only that a grievance must be filed within 15 working days of the event or the condition that's being grieved. The district court's requirement, however, required that he essentially file a grievance before suffering his injuries, which doesn't make sense, but it also misunderstands the prison's grievance policy, which brings us now to the Department of Corrections argument, which it's notable that the Department of Corrections does not defend the district court's or the way that they have reasoned through the exhaustion issue, but rather bring forth their own argument that they did not raise in court below. The Department of Corrections argues that Mr. Znicchielli failed to exhaust his remedies because he didn't fill out a specific disability accommodation form before filing the grievance, but this also presents several problems of its own. The first of which is that the DOC, again, did not mention this requirement during the grievance process or in the district court, but second of all, this argument answers a completely different question than we actually have here. So their argument seems to be saying essentially that Mr. Znicchielli needed to obtain an accommodation for his disability before grieving his cell placement, but in response to Mr. Znicchielli's grievance that he filed, the record clearly shows that the prison grievance officer explicitly stated that the cell assignment was a mistake because Mr. Znicchielli already had a documented disability. Furthermore, the DOC concedes that he's had this accommodation in the back section of their brief on appeal. And so in order to have had this documented accommodation, Mr. Znicchielli, you know, notwithstanding any other way that he could have obtained this documentation that the DOC does not provide nor the grievance officer indicated in their response, he already had this accommodation. And so by the DOC's argument in their brief on appeal, an inmate would have to re-request an accommodation for a disability that they had already been granted and that the DOC had determined was necessary to mitigate a risk every single time the prison fails to essentially follow their own rules. So let me just jump in here and say, you know, that a lot of this, there's not a great degree of fit between the blue brief and the red brief. Your blue brief, your opening brief raised two arguments, and then the defendants, the FLEs, pivot and start raising a bunch and a bunch of other arguments. And at one level, that may bode well for your argument if they're pivoting to other places, but also we have this rule that says we can affirm a district court's judgment for any other reason in the record. Now, there's obviously limits to how far we can go with that, but I guess one thought is, it strikes me that when I read this record, if we put aside the exhaustion issue, Mr. Zanmichielli fell when they were trying to switch him to a lower bunk. And it strikes me that in order to prevail, there has to be a showing, a connection between deliberate indifference and the injury. And it's hard at one level to say when they were trying to get him to a lower bunk, they were deliberately indifferent to his need because they were actually moving him to a lower bunk. And so putting exhaustion to one side, we have that issue, I believe, raised below in front of the district court. It wasn't the reason the district court denied or granted summary judgment to the defendants, denied Mr. Zanmichielli's claim. But I mean, at one level, if that reason's in the record, and we move exhaustion to the side and just say, where's the deliberate indifference of the people who were moving him to a bunk during which time he fell? What do you say to that? Your Honor, I see my time expires soon. May I have leave to answer your question fully? Yeah, sure. Thank you. So as to the first issue, respectfully, Your Honor, we can't necessarily fully put aside the issue of the exhaustion question because that is the issue. We have to answer the exhaustion question first. However, putting that aside for the sake of argument in terms of the merits... We don't even have to put it aside. Let's say you win the exhaustion point. We'll even do that one better. You win the exhaustion point. Now what happens, because the answer is district court judgments can be affirmed for any reason in the record. And granted, there's a big pivot in the red breeze to these other reasons in the record. But the question is, you were about to get to it, but I just want to let you know that it wasn't that we get to it by way of bypassing the exhaustion. All right. Thank you for the clarification, Your Honor. The DOC made Mr. Zmichele go up and down the stairs hundreds of times. The issue was not simply that he was assigned a cell and immediately upon being assigned that improper cell, he said, this is not in compliance with my documentation. And the prison said, oh, apologies. We are moving you right away. This was an issue where he repeatedly several times said the prison is not following my documented required accommodation for my disability, which puts me at serious risk of danger having to walk up and down the stairs several times a day in order to access services. And they did not do anything about it for several weeks until they physically saw him start to show signs of a seizure, take him to the hospital. And at that point, at the direction of the DOC, they followed their own rules and granted him accommodation. It's a very different situation if they had for several weeks ignored his request. But was he moving his belongings from his upper cell down to the lower cell when he fell on the stairway? Yes, Your Honor. He was. And so maybe the Department of Corrections should have moved his belongings down the stairs for him. Yes, they probably should have. Again, that's a merits question that would go to whether or not this constitutes deliberate indifference. But regardless of that, the fact that he had been required previously to walk up and down the stairs at great risk to his personal safety hundreds of times prior to being moved and the fact that had they followed their own rules in the first place, he wouldn't have had to be on the stairs in that moment when he had the seizure. The deliberate indifference is still very clear. They knew the risk because it was in the record. I apologize. It was in his record, in his file. He alerted them that it was not being followed and they did not do anything about it. So one of the issues in prison litigation, law enforcement litigation, many types of litigation, is that there's many individuals who regulate prisoners. So some people are the guards, some people are in the medical, some people are the wardens. There's many, many, many people involved in this. And so when we talk about deliberate indifference, it's natural at one level to kind of collectivize everyone's mental state and say, okay, if this person knew, then this person should, that should be imputed to another person. But on the flip side, the people who were overseeing the fall might not have been the ones who didn't give him the accommodation. Overseeing the transfer from the upper to the lower might not have been responsible for not doing the transfer earlier. And those that were not doing the transfer earlier might not have been responsible for not carrying his belongings with them. So absent kind of a collectivization, an imputation of mental state of deliberate indifference to everyone, I mean, this is how a lot of these cases break apart, is because there's a big showing of mental state that then everyone might have some degree of mental state, but not enough to rise to deliberate indifference. So are you saying that the, I believe two guards who watched him go up and down knew before and had the power before to put him in a lower bunk? Yes, Your Honor. And there's two issues there. The first is that his accommodation that he needed this was in his file. This is not a situation where an inmate has a disability and has to request an accommodation that perhaps has not yet been cleared, but everybody or certain guards maybe know it's necessary. It's not that situation. This is in a documented accommodation in his prison file that all defendants would theoretically have had access to because it is in his public file. And again, though, as to your question on a more granular level, that is a question for the merits. That is a question for a jury to decide who knew what when. But as an issue of summary judgment, to say as a matter of law that there's just no way to know, despite the fact that this was in his file and the fact that he told the guards several times that he needed to be moved to follow the prison's own accommodation, to say as a matter of law that he, that no reasonable prior fact could possibly find that any of the named defendants could have known that he needed this accommodation would just be very inconsistent with the way that this court has held in the past to handle those kinds of cases. Well, unless my colleagues have questions on this point, were you going to speak to the retaliation claim as well? Your Honor, if you'd like me to answer any specific questions about it, I'm happy to. But my co-counsel, if not, the plan had been for my co-counsel to speak about them on rebuttal while also addressing anything else in rebuttal. Well, I think if she speaks in rebuttal, the affiliate will not have a chance to rebut her in their presentation. I think we need to see a little bit on retaliation up front. Of course, Your Honor. Absolutely. Then I will, with your permission, I'll proceed to speak a little bit about the retaliation. The issue on the retaliation claims, the district court essentially reasoned that because the defendants had put forth written documentation of valid reasons for the discipline that they imposed, there can be no viable retaliation claim. But this court in Watson versus Rosam held that the standard in these kinds of cases is for whether prison discipline comports with due process, but is not sufficient for retaliation claims. The standard, the proper standard for whether prison discipline comports with due process is whether the prison has some evidence to support the discipline imposed. That is the standard that the Eighth Circuit applies for First Amendment retaliation claims. But in Watson, in this court, rejected that standard already. In this circuit, in a retaliation case, the question is not whether the prison discipline was objectively justifiable, but rather the question is whether the prison did something they otherwise would not have done because of retaliatory motive. This court in Watson held that the issue on summary judgment is whether a reasonable trier of fact could conclude that the misconduct was issued in retaliation for, in Watson's statement, that he was going to file a grievance and not in furtherance of a legitimate penological goal. Can I just interrupt you here? Because we're focusing on First Amendment retaliation and the predicate to all First Amendment retaliation, as I understand it, is the exercise of a First Amendment right. And so not all speech is First Amendment protected. Slander is not protected. Fighting words are not protected. Many things aren't protected. Okay. Unfortunately for our are protected too. But I guess my question is, in order to state a First Amendment retaliation claim, I think you have to start with protected speech. So could you just identify with as much particularity as you can what protected speech Mr. Zemecheli engaged in? Your Honor, the protected speech is the filing of the complaint. And filing of complaints in, or I'm sorry, filing of grievance, not the complaint in federal court, the grievance filed in the administrative process. And filing of a grievance is protected under the First Amendment. DOC never disputed that. So that is the first issue of whether or not it's constitutionally protected. And do you have a cite for that grievance in the, is the grievance, it's not his request, is it his request for accommodation that's his grievance? Or is it else in the record? No, Your Honor. The grievance about the retaliation claim is a completely different set of circumstances. This was in regard to complaints that he filed against two different medical defendants regarding the fact that they told him they were going to issue him misconducts for something that he testified he did not do. So these are the Do I have that? Am I looking at the right ones? I'm looking in that space. Your Honor, I believe so. I apologize. I'm okay. Yes. And some of these grievances seem to relate to the top bunk, bottom bunk, right? Yes, Your Honor. But those are not related to the retaliation claims. The grievances with regard to top bunk, bottom bunk are in relation to our Eighth Amendment and ADA claims. And the retaliation claims have to do with the retaliatory misconducts that were filed against Mr. Zmichelli and the transfer. But turning now back to the district court's analysis of these retaliation claims, the district court again, issued or analyzed the retaliation claims under a standard that this court has already rejected under Watson. In Watson, the idea that just because the prison put forth a documentation that Mr. Zmichelli had committed some kind of inappropriate or unpleasant conduct is simply not enough under the proper Watson standard to override the testimony that the guards told him that they were being put forth out of retaliation. Let me follow up on that. Let me follow up on his testimony. Because at one level, his testimony is not percipient testimony at one level, right? His testimony is about what guards told him. He doesn't identify the guards. He doesn't say anything else about those guards. He just says what they told him. And so in order for that testimony about what someone else said to be admitted for the truth of the matter asserted, it either has to be not hearsay in the way of an admission or something else like that, or it would have to fall into a hearsay exception because we don't tolerate hearsay at summary judgment. And so what do we have to prove that this is a hearsay exception? Your Honor, if I'm remembering correctly, the hearsay issue is that this is a defendant admission, which means that that can override any hearsay issues. But we don't know that it's a defendant. So one, we don't know that it's a party admission. I mean, a lot of these hearsay exceptions are easy to prove, like business record is kind of easy to prove, but you have to put in some proof to show that something's a business record. You can't just say it's self-evidently a business record. It takes some authenticity, maybe self-executing in certain instances, but hearsay is not. And so all he says is that guards told him. He doesn't identify the guards by name. We don't know that they're a party. We don't know any of the other details about this to meet one of the four or five ways that something can be a party or attributed to the party as an admission. And so his statement strikes me as the guards told me that was transferred without identifying who, so we don't know that they were parties, without providing any other info, seems to be very, very thin proof that this would even qualify something other than hearsay. But aren't all the guards employees of the Department of Corrections? So for that, all the guards would be agents of the defendant and the ability to identify the way to the evidence rather than the disability. And we would still have to need proof, though, that they were in within scope and other elements for agents to actually bind their principles as admissions. And so we don't have anything along those lines, do we? Or do we just have this statement? Your Honor, there's a couple of different points I'd like to touch on. The first is that this is exactly the kind of question that the district court has to address and parse through below. We just need them to do it under the proper standard, which is Watson. The second thing that's important to remember is that the very nature of prison life is that an inmate is almost never going to have an ability to document a conversation other than by saying, other than by testifying as to the conversation that he had. Again, that's a question that would have to be addressed on the merits. But to say that as a matter of summary judgment, for summary judgment purposes, that no jury could possibly believe that his testimony is credible on the whole of the record would be a very large step. And as to Judge Roth's point, yes, he did name several of the guards at issue. They all do work for the DOC. And we know that from this court, so long as an inmate does not name someone by name but gives a job description or a job duty, as long as it is clear enough to put them on notice, that that is sufficient to These guards that he says told him, were those at the new prison or the old prison? Your Honor, they were at the new prison. So are any guards at the new prison named as defendants in this case? No, Your Honor. However, they are employed at the new prison. And so let's just find out what the basis of their knowledge is, right? Because we aren't going to let them testify. We aren't going to let their statements that might be based on hearsay that they've heard, did they say, we know for a fact? I mean, at one level, Isn't this the weight of the evidence rather than the admissibility? But to the question of this is, when we go to whether or not something can be decided at summary judgment, we look to whether a reasonable jury could do this. When we look to what a reasonable that these were parties to the case, therefore they were party admission, but I don't think they are parties. These guards were parties. And so I guess my question is, why is this even in play? And if it is in play, isn't it weight, it's weight so low that a reasonable jury would be justified in giving it almost no weight and therefore making summary judgment under and Anderson permissible. Your honor, that again, that, that has to be a question for the court below under the proper Watson standard. And to say that as a matter of law, that Mr. Sneakily testimony is, is just a, no reasonable trier fact would possibly believe it. That would be making a credibility determination in this court. And that's a, that's a determination that has to be done by a finder of fact. So you think, you think that he's given more than a scintilla of evidence. You think his statement amounts to more than a scintilla of evidence that unnamed guards, the new prison who aren't party opponents who did give no basis for their knowledge of this fact amounts to more than a scintilla of evidence. Yes, your honor. Your honor, if there are no further questions, I will, I will end my time here. Thank you very much. All right. I understand that we'll hear from counsel for the appellees. Mr. Kowalczyk. Yes, your honor. I'm Anthony Kowalczyk. May it please the court. I represent the, the DOC parties include the Pennsylvania department. Can you keep your voice up, please? Yes, your honor. Can you hear me now? Yeah. Okay. Yeah. I represent the 10 main DOC employees, but again, you just ripped it off. Okay. I'll, I'll try to get, can you hear me now, your honor? Yes. Okay. With respect to the issue of retaliation, there's an important thing that, that needs to be said from the outset. Okay. First of all, all of the retaliation claims against the DOC parties are based on the transcript. Every single defendant named in the amended complaint works at SCI Green, not SCI Huntington. There's a follow-up to Judge Fitz's question before. And the testimony of Mr. Zammichelli was that he heard somebody at SCI Huntington say why he had been transferred. I'm having trouble hearing you. I'm sorry. Okay. I, I'm not sure how to, I'm as close as I can get to the microphone right now. I don't know. Can everyone else hear me? I don't. Yeah. I think you just give it a go the best you can right now. You're in and out with me, but just, just, just do the best you can. Lean in as much as you can to the microphone as I get the only advice I have. Okay. The testimony of Mr. Zammichelli was that someone at SCI Huntington told him that he had been transferred for two reasons. One was for his complaints at SCI Green and two for his own protection. And it's very important to point out that Mr. Zammichelli testified that the reason why he was at SCI Green in the first place was because a nurse at SCI Rockview had sexually assaulted him. I'm sorry. I'm, I'm not hearing you at all. I don't know if it. Your Honor, would you like me to call it on the telephone? I don't know. My clerks who are streaming the audio are not hearing it either. Okay. Your Honor, would you like me to call it on the telephone? I, there's a phone number and I can try to see if that works better. I can use the line. I appreciate that. All right. Let me see if that will work. I apologize for this. I don't know what else to do right now. Alrighty. Hello. Hello. Hello. Hello. Someone admit me to the argument. I'm sure your video. All right. So we don't have any feedback. All right. Try speaking. Okay. Your honor. Can you hear me now? I hear you loud and clear. Thank you very much. Okay. Okay. The testimony that Mr. Sam, a Shelley gave was that someone at Huntington, you know, can I leave the zoom meetings to eliminate the echo and then talk just on the phone on the phone on the phone? That's good with me. Yeah, I'm good. Okay. Can you hear me now? Your honor? Yes. Yeah. Very good. Okay. Thank you. I apologize for the technical issues. I'm not sure what happened there. But the testimony that Mr. Sam, a Shelley gave was that was that individuals unspecified D. O. C. employees at S. C. I. Huntington told him that he had been transferred for two reasons. One was his complaints at S. C. I. Green. He's not specific about which complaints the other. The other reason was, he said, for his own protection, because he accused Miss Austin of sexual assault, just like he had accused someone of sexual assault. A nurse at S. C. I. Rockview his testimony was that he had that he had been transferred from S. C. I. Rockview to S. C. I. Green because of that assault. That's what he testified to. And then he later testified that his transfer on April 17th, 2017 from S. C. I. Green to S. C. I. Huntington had been because of his complaints, which presumably includes his complaints against Miss Austin and against an individual named Jones, who's never been served with process and for his own protection. And the way that that I look at this case and the way that the D. O. C. parties do is it's important to understand that the retaliatory transfer claims are all based on the testimony of Mr. Zama Shelley, which even if we assume and I'm not conceding, but even if we assume that it's admissible. Obviously, it's not entitled to much weight, but even if it's credited, even if it's admitted and credited, it would not establish a prima facie case against any of the D. O. C. parties. It's important to point out that the D. O. C. is obviously not a person amenable to suit under Section 1983. Mr. Zama Kelly cannot bring a Monell claim against the D. O. C. akin to the kind that was at issue in Hill versus town of Scranton against the town. The retaliatory transfer claims are obviously have to be brought against any of the 10 D. O. Named D. O. C. officials. He doesn't identify a single one of them in his testimony as harboring a retaliatory animus based on anything he did at S. C. I. Green. In his reply brief, he refers only to Mr. Gilmore, who is the superintendent at S. C. I. Green. I read that as an implicit concession that he has no prima facie case against any of the other nine. But even if you look at it from the standpoint of Mr. Gilmore, there's no evidence in the record that Mr. Gilmore had a retaliatory animus against Mr. Zama Kelly based on anything that he did at S. C. I. Green. Would he have been transferred if all this question of filing grievances had not come up? Yes, Your Honor. I'm sorry. Go ahead. Would he have been transferred anyway? Would the same decision have been made? Well, yes, Your Honor. Tracy Sholly submitted an affidavit which states that the administrative transfer occurred because Mr. Zama Kelly sent unpleasant request slips to a member of the education staff at S. C. I. Green named Dr. Kelly. And that was the reason in the record that is in the record. There's an affidavit from Miss Sholly who works for Mr. Gilmore explaining that that was the reason for the transfer. But the bottom line is we don't even get to the same decision defense in this case with respect to the transfer claims, which are the only claims against D. O. C. defendants, because he has not established that a single D. O. C. employee harbored a retaliatory animus based on his filing of grievances at S. C. I. Green. So you're basically saying, so what you're saying is, look, Watson is in probably an important and very interesting case, but we don't even get to Watson here because we've got problems with retaliation claim to begin with. That's correct, Your Honor. I mean, Watson speaks to a situation involving disciplinary action brought against an inmate under circumstances in which there's evidence that the inmate engaged in protected activity. And then there's also a situation where there's evidence that the prisoner violated a prison rule. And the issue is whether the protected activity caused the misconduct or whether the conduct that that is described in the misconduct notice is what actually caused the misconduct issue. A transfer is not a disciplinary action to begin with. The decision to transfer can be made in the absence of any misconduct. It can be done for a multitude of reasons. Now, in this particular instance, improper reason, it could be retaliatory. Well, Your Honor. Okay. Under this court's decision, Rouser versus Horn, I read that case to mean that a transfer can be actionable under the First Amendment if it's adverse to the to the the inmates interest to the point that it would deter him or her from filing a grievance. Okay. But even if we assume that it was adverse to Mr. Zamichaeli in this case, okay, there's no evidence that it was for an improper reason, because the conduct that we're talking about, first of all, okay, the the request slips to Dr. Kelly had the unpleasant nature of those slips that are described in Sholley's affidavit as the reason for the transfer have absolutely nothing to do with the conduct that Mr. Zamichaeli claims is protected. But even if you were to completely credit Mr. Zamichaeli's testimony and just assume that he was transferred for events that transpired at SCI Green, that would not be an improper reason for the transfer. Because he testified that he was transferred to SCI Green in the first place because he was, as he describes it, assaulted by a nurse at SCI Rockview. He made the same allegations against Miss Austin after she charged him with misconduct on February 24th, 2017. And they also had a situation where he testified, this is according to Mr. Zamichaeli, this is not the reason for the transfer, I'm assuming if you credit his testimony, that someone named Mr. Jones, who has never been served with process, who's not a defendant in this case, attacked him and tried to get him to withdraw his PREA complaint against Miss Austin. And Mr. Zamichaeli testified that he heard at SCI Huntington, again it's hearsay, that he was transferred for his own protection. Under those facts, the transfer was justified for the reasons Sholley gave, and the reasons Mr. Zamichaeli described would also justify the transfer. And at a bare minimum, even if there was, and there is not a genuine issue of material fact as to retaliation, there clearly isn't, no reasonable jury could find for Mr. Zamichaeli on the First Amendment retaliation claims. But even if you assume that there was, under these facts, it's clear that any of the named defendants would have been entitled to qualified immunity in a situation where, if you take the facts as Mr. Zamichaeli describes them, and take his testimony at face value, they transferred him for his own protection, or because he made allegations that may have been false. Maybe they were false. In either case, it makes sense. So just to keep us a little bit on schedule, I have no further questions on the retaliation point, unless either of my co-panelists do, it might be worthwhile for you to address exhaustion, or maybe your arguments that kind of fill in for exhaustion, to the extent that you aren't raising just an exhaustion defense. But before we do that, Judges Roth or Nygaard, is there anything that you have on retaliation? No, I do not have anything. Okay, Your Honor. Yeah, I can definitely move to exhaustion. The question as to exhaustion is claim-specific, as the Supreme Court recognized in Jones v. Bach, this court recognized in Shifflett v. Korsniak. And the regulation does require, number one, naming the individual involved, and number two, naming the events in question. We have a multitude of claims against – yeah, I have 11 defendants in this case. And the events are going to vary from one claim to the next. We know that in the grievance that he filed, he only named Ms. Staley and Mr. Spiker in the grievance. Under Byrd v. Shannon, he clearly did not exhaust his claims as to any of the other defendants. With respect to the claim against the DOC, because the ADA claims, obviously those claims cannot be brought against the individuals. The individuals are not public entities under Title II. They're not recipients of federal funding. So the claims against the DOC under the ADA and the RA were clearly not exhausted. Mr. Zamicheli testified that he did not submit the disability accommodation request form that was required to lead to a determination by the COID Act as to whether an accommodation was in fact necessary. And then in his grievance, which was filed after he was transferred, he never invoked his rights under the ADA or the RA. And he also didn't allege that he was denied access to a program or activity. During the appellant's opening argument, I heard appellant's counsel say that he went up and down the steps hundreds of times from the upper tier to the lower tier. Well, that means he obviously was not denied access to a program or activity, so he can't establish a violation of the ADA. The important thing that I want to point out about exhaustion is there's been a lot of discussion about a notation in his files at STI Rock v. March 21, 2015, that a nurse indicated that he should be housed on the lower tier. That's not a determination that the ADA requires that specific accommodation for that specific inmate. That is simply a practice of the DOC, because a determination as to whether someone's entitled to a reasonable accommodation under the ADA would depend on an individualized inquiry as to whether that inmate is substantially limited in a major life activity and denied access to a program or activity because of that disability. Mr. Zamichieli was not... Excuse me. Judge Naggard, did you put in what I wanted to say? When we're dealing with a prisoner, unrepresented, not represented by counsel, don't we give a little leeway to what he pleads? To what he pleads? You mean in the grievance or in the complaint? I'm not sure I understand the question. I think both. We can't expect a pro se prisoner to conform with all the complicated niceties of legal process or of cause and effect in legal proceedings. Well, Your Honor, I think that question's accounted for by the Supreme Court's Ross v. Blake determination that sometimes the procedure can be unavailable under the PLRA because it's too opaque or difficult for a prisoner to navigate. But in this particular case, Mr. Zamichieli testified that he was told that he had to submit the disability accommodation request form, and he acknowledged that he didn't do it. Let me just interject here. I think Judge Ross' point doesn't go to whether or not he knew to submit a form or not knew to submit a form, but kind of how we construe what he wrote on the form. Judge Ross, I don't know if that's what you were getting at. Basically, yeah. Your Honor, I think even if you apply the generous standards and read it in the light most favorable to Mr. Zamichieli, the grievance doesn't allege that anybody other than Staley or Spiker did anything. If we were to apply the most generous pleading standards out there, kind of like Notice Pleading Plus, we'd still require that you name each of the individuals. We might be very, very, very generous with how we construe the substance, but there's always a requirement to name the individuals. So to the extent, though, that only two individuals are named, maybe that means that the other eight weren't exhausted. But with respect to those two, don't we have to look at this in a very, very, very favorable light to Mr. Zamichieli? I believe so, Your Honor. I mean, I'm not disputing that point. As a matter of fact, in the brief, I point out that that's precisely why we go to great lengths to explain why Ms. Staley and Mr. Spiker never violated the Eighth Amendment, because those are the only claims that are arguably exhausted. And that's kind of a weird point to raise in the appellate brief when that wasn't part of the, at least maybe it was, but I'm reading the decision below. I don't see that to be a basis for the district court's opinion. And that doesn't mean that we're technically prohibited from doing it, but the more and more and more that we get away from issues that were fully briefed in the district court, the less and less and less we're probably inclined to exercise our discretion to rule on that, because there may be more evidence that every party would want to put in at the district court level had they known that this was the thrust of the case. And so not to take anything away from what you argue on appeal, but in fairness, shouldn't that argument just be presented in the first instance at the district court so that if there's any contrary evidence or anything else that Mr. Zamichieli would like to put in, he would have the chance to do so, which now he's kind of a little more hampered by the appellate record. Well, Your Honor, I don't think there's any basis for a remand simply because the evidence, the record is developed to the point where we already know, number one, that Mr. Zamichieli was in fact transferred as soon as a nurse determined on February 13th, 2017, that he should be housed on the lower tier. As soon as that happened and Mr. Zamichieli was in the hospital, he came back and Spiker immediately said, okay, you're going down there tomorrow. And that's not disputed. There's also nothing in the record which indicates – I mean, the record is clear and developed. He was consistently told that if he got medical approval, that they would find a cell for him on the lower tier, which in fact they did as soon as a doctor said that he should be housed there. Now, he says that he went to Natalie Austin and asked her to initiate that process, and she in an affidavit said that that conversation never took place. But there is absolutely no evidence whatsoever that a member of the medical staff urged anyone employed by the DOC to move him to the lower tier before February 13th, 2017, and he was moved on the 14th. So under these facts – I'm sorry, go ahead. No, no, no. You can finish your point, but unless Judges Nygaard or Roth have other questions, I know that you're not the only – you're over time even with the mic issue, and Mr. Ferrante wants to argue on behalf of his clients. So if there's anything else you want to say, by way of brief wrap-up, that's fine, or if the other judges have questions, that's fine. The only thing I'll say, just to wrap up, I'll answer any questions that you may have, but in terms of allowing the litigation to continue further, under the record as it's developed, the court would have to look under Behrens v. Pelletier at the record and determine whether there's any clearly established violation to overcome qualified immunity, clearly, at a bare minimum, Staley and Spiker are entitled to qualified immunity on the basis of this record, at a minimum. I'll address any questions the court may have. Hearing no questions, thank you. Mr. Ferrante? I think you're on mute. You might be on mute. Can you hear me now? Yes. Yes. Thank you. I'm just like the commercial. Your Honor, I represent Austin Writing in HICE. HICE is a manager in the medical department. This is a unique case because we have Mr. Zamichelli arguing that he had put everyone on notice of multiple things, that he wrote inmate requests, that he sent letters to the superintendent, that he sent letters to the CHCA, that he sent letters to everyone, filed sick-haul slips, filed notes, inmate request forms to the superintendent. Unfortunately, none of that exists. And I open with those remarks because that's really the core here of the case. There is nothing here other than bold allegations. And when we have just bold assertions and legal conclusions, we have a situation where the district judge appropriately ruled and granted summary judgment on behalf of my clients. You cannot rest the case in an appeal just on unsupported facts. With respect to the area of exhaustion that we just left, Mr. Zamichelli did not file any grievance, and I think that's confirmed by everyone, until after he fell. Now, prior to that, there is no existence of any contact with my client asking for a change in his housing, that he was housed on the incorrect floor, or anything like that. Let me just follow up on this point because this is a real bone of contention in the briefing, the timing of the grievance. I think I used this example before because I think I got it from one of the cases I read in reading up on this case. But if an inmate has a radio, and the radio gets broken on Monday by another inmate who had been saying for weeks, or by BARD, turn the radio off. And that gets broken on Monday, and the inmate files a grievance for the broken radio on Tuesday. I mean, we don't say to the inmate, you should have filed beforehand because you should have known that someone might have broken it. And so, a filing of a grievance for a broken radio on Tuesday is fine, so why isn't the filing for a fall the next day, thereabouts, fine as well? Well, the fall isn't the issue. His grievance goes that he should have been housed on the upper tier. I'm sorry, the lower tier rather than the upper tier. Well, I mean, again, it's almost like what they say about property. It can be a bundle of sticks, and maybe the same can be said of grievances. They can be a bundle of sticks. Certainly, part of his grievance is that he should have been on the upper tier, he should have been on the lower tier. But in fairness, I think one of those other twigs in this bundle is that he fell. Well, and so if that's another twig in the bundle, metaphorically speaking, then what's wrong with that? What's wrong with him doing that? Well, Your Honor, let's look at those twigs then. We have someone who testified that he knew he should have been up on the lower tier. He should have been there on December 30th. Okay, we have a 15-day rule in order to file a grievance. There was some argument that maybe he should have used the grievance process, Administrative Rule 804, which says maybe he can try to work something out. There is absolutely zero evidence in anyone's file that he spoke to anyone about that. But maybe his grievance is, I fell down the steps because I was put on the top tier and I shouldn't have been put on the top tier. And I'm really falling down the steps because of the inappropriate placement. He knew, Your Honor, from being on the top tier on December 30th, he should not have been there. And the day he was up there, he had a grievance. And the day that he fell down the steps, he had a particular grievance because physical injury was caused to him by the alleged negligence of the prison in putting him on the top tier and letting him carry his stuff down the steps when he was moving to the bottom tier. Well, my clients didn't have anything to do with placing them in a cell and had nothing to do with carrying or being able to assign someone to carry items down to another cell. Maybe he should be arguing this point in the first place. I'm sorry, Your Honor. Are your clients named in the grievance? No, Your Honor. And that was my second point. What's named in the grievance are the two individuals that counsel for the DOC indicated. There is a vague reference that said he spoke to the medical department. Now, the medical department consists of maybe hundreds of people. We have people that are employees of a medical vendor. We have people that are employees of the DOC. There's no indication anywhere identifying who these people are that may be in the medical department. I know counsel brought up in her argument that you can bypass naming these individuals by just having a job description. Saying someone was in the medical department is not a job description. The cases that follow that, you're saying basically getting enough information as required under the Administrative Rule 804, who that person may be. If it's someone, if he got hurt in the shower, you know, the guard watching me in the shower on Monday and was present when I fell. I don't know his name, but we know enough that that's the person who may be the correct recipient of that grievance. Now, that's not done here. In the one case that was cited, the Sproul case, in that case they allowed it only because in the grievance response and everything, they identified Physician's Assistant Brown. Since everyone knew it was Physician's Assistant Brown, the grievance was upheld. We don't have that here. Neither the grievance or any of the responses make any reference to any medical personnel. Moving over to the retaliation claim. We have three main cases. We have Rausser, who gave us the three pong requirement. We have Carter, and we have Watson. Now, with that, the district judge in this case reviewed all three of them and came up with the right decision. Rausser's three prongs, I just want to touch briefly on the third prong regarding PA Austin. PA Austin filed a misconduct against Mr. Sammichelli on February 24, 2017. In that, she indicated that he exposed himself while in the medical department, told him, don't do that, and then he readjusted his pants so his penis was hanging out. That was 10 o'clock in the morning. She then tells the block officer, writes up her report, and later on, when the block officer comes to Mr. Sammichelli, he says, oh, by the way, I was sexually assaulted by Ms. Austin today. And files a grievance, files a PREA complaint, and an investigation takes place. Not only a grievance investigation, but we're dealing with a PREA investigation that was conducted by others. It was interviews by Sammichelli, interviews by Austin. Both decisions found, upheld the misconduct, number one, and with the PREA complaint, said that it was unfounded. One of the important factors in all of this, and one that even Judge Edie brought up in her complaint, is when we look at the quantum of evidence that's being presented for the misconduct, that is one element that we look at, and that is also one element that the court looks at and gives deference to with respect to prison retaliatory hearings, disciplinary hearings, the outcome of those hearings. And we have a long line of cases from Carter to even Watson, to Williams versus Felino, that great deference has to be supplied to that. There is no some evidence requirement. Judge Edie did not read the law wrong, did not make mistakes, anything like that. What she did was go over the record that was produced. Mr. Sammichelli produced nothing other than his own statements. All investigations showed that the misconduct was appropriate at the first level. He then appealed it to a prison review board, which contains laypeople, and they also upheld the misconduct. The PREA complaint was denied because it was unfounded. He has a history of raising sexual abuse allegations against people in the medical department and people in the employees of the DOC. At the time that this took place in February 2017, he had already been transferred from two prisons for having misconduct, for either exposing himself and then filing grievances right afterwards, saying, oh, by the way, they told me if I complained about having sex with these people, I was going to be written up and sent to the hole. That happened at two separate prisons, and now he's here at Rockview, the same thing happened. The hearing examiner had all that information. That is the quantum of evidence that Judge Edie had in her hands. That is what she viewed. And the same thing applied for Ms. Austin. We've been generous with everyone with time, including you today. I don't have any further questions of you, Judge Roth or Judge Nygaard. Do you have any questions for Mr. Carrante? I have none. I have none. Okay, thank you very much. We will hear from Ms. Elchizek on rebuttal on behalf of Mr. Zamichelli. Thank you. Thank you, Your Honor. May it please the court, Jennifer Elchizek for a felon who belongs to Meekie Alley. Can everyone hear me? Yes. All right. First, I'd like to address some of the things the opposing counsel for the Department of Corrections has said. The first point, perhaps the most important point, he stated that the allegations of unspecified inappropriate conduct have nothing to do with Zamichelli's First Amendment-protected activity. Well, yes, of course that's true, Your Honor, and it is true because it is a pretext. DOC is not going to say in writing, yes, we transferred him because of this First Amendment-protected activity. Instead, they wrote in writing that they are transferring him because of this unspecified request slip or slips that someone found unpleasant and inappropriate that provide absolutely no detail as to what he said or why it was unpleasant or inappropriate. And without that information, Your Honor, I don't think it's possible to even speculate about what a reasonable trier of fact would or would not conclude as to the possible motives for the transfer. The burden is on DOC to prove that no reasonable trier of fact could conclude that the transfer was for retaliatory motives, and DOC has not met its evidentiary burden to establish that. Now, moving on to the exhaustion issue, the claim-specific requirement refers to specific sets of facts, not to every possible legal theory. An inmate is not required to plead any particular legal theory because that is not the purpose of a grievance. The purpose of a grievance is to put the prison officials on notice that there are problematic conditions that the prison needs to change. That is not the same as specifying between an Ace Amendment claim or an ADA claim or any other specific legal theory, so long as the relevant facts have been fled, that is sufficient. Is identifying the prison officials or other individuals who caused the harm, at least identifying it with some identifiable predictability, part of a claim-specific grievance? Well, to some extent, Your Honor, but this court held in Trevelyan that names, that level of specificity, is not required and Zemeckiyo is not specified. So beyond – so we know that, like, if a person names someone, we don't really have an issue about specificity. So we understand that names might not be – names are good in terms of specificity, but names might not be required. But in lieu of names, something is required, right? It's not names or nothing. It's names or some degree of specificity to get some sense, you know, notice, to identify, to redress, right? Well, yes, Your Honor. I think we have to keep in mind that, especially as regards to medical defendants, the prison keeps detailed records of which inmates see which medical staff. So they should easily have been able to piece together which medical staff Zemeckiyo might have been referring to. And it wasn't just – it wasn't – it could have been any of the hundreds of people employed. They would have looked at these records and narrowed it down to a few people that he had talked to on a given day. And that should have been fairly straightforward in their computer system and with their own records. So I would argue that is a sufficient degree of specificity. Well, I mean, at one level, that degree of specificity could be – I mean, that imputes a lot to a prison because their computer records will tell them a great number of things. Maybe you could just say a prison official and then that would – and give a date. And the prison could check who worked that day. They could check all these other things. So, I mean, at one level, almost any extra layer of detail would suffice. I think that's a very – that's a very fact-bound question, Your Honor. And there are certainly cases where perhaps that wouldn't be sufficient degree of specificity depending on what type of records were kept or exactly how broad the allegations are. But for this particular case, I don't think it's disputed that these records exist or that the prison keeps these records and that Zemeckiyo primarily saw only a handful of medical staff. So I would argue that there was more than enough information provided. As to medical staff, as to other guards and other prison officials, when two are named, others aren't, and then medical staff is left a little bit general, it stands to reason, then, that someone who's not named and who is not medical staff is not included in this grievance. Is that right? I don't think that's necessarily true, Your Honor. Again, that's going to vary from case to case depending on the facts. But in this case, the substance of his grievance was the cell placement that led to his fall down the stairs. So he named the two guards that were present for his fall down the stairs. As to who exactly was involved in the cell placement, who exactly had control over that, I think we have to keep in mind we're dealing with an incarcerated pro se inmate who is not necessarily going to know all of those things or have access to all of that information and certainly not be able to learn it and document it within the required 15-day timeframe for filing the grievance. So I think so long as he's pled the required relevant facts, which he has, I believe he's entitled to a certain degree of deference on that point from this court. I mean, just to tease this out, if all of a sudden an inmate goes to a cell and they decide to turn the power out, he might not know who's behind the power box. He could just say, my power went out on this day. I know someone at the prison did that. I don't have lights in my cell. At one level, he or she has no way of knowing that. And so what you're basically saying is we get to a certain point in time where if an inmate could reasonably know who it was, for instance, they had a personal interaction with this person, then maybe more specificity is required. But the extent that it's unreasonable to expect an inmate to know, then less specificity is required. We say it's fact-based, but I'm trying to give some dimension to those fact inquiries. Yes, Your Honor, in that hypothetical, then if the inmate has no way of knowing that there's no power in his cell, but obviously him not having power in his cell is a problem that is a grievable issue, then yes, honestly, that's a wonderful example, because what choice would he have other than to grieve that? I think we have to keep in mind that under school, the purpose of a grievance is to put prison officials on notice of conditions that need to be fixed. It's not to preserve legal claims, it's not to document every possible defendant, and it's not to name every possible legal theory that could conceivably arise from those sets of facts. It's only to put prison officials on notice that they need to fix these conditions. I'd like to move on. Okay, I'm sorry, Your Honor, I see my time has finished. If you have any further questions, I will be happy to answer them. If not, I thank you for your time and your consideration. I have nothing further. Judges Roth or Nygaard, is there anything further that you have or any additional topics that you'd like to hear counsel address on rebuttal? I have none. I have nothing further to say. Thank you very much. We very, very, very much appreciate the University of Virginia Law School's effort and dedication to this case. It showed in the briefing, it showed in your presentation today. We thank all counsel, and we'll take this matter under advisement. Yes, I commend the University of Virginia students. I thought they showed hard work and good presentation. And we didn't go easy on you, as you may know. So, to the extent that you wanted a real taste of appellate argument, I hope you leave with some satisfaction that you got.